UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

KIRK MCLEOD                        :
                                   :
        Plaintiff,                 :
                                   :
    v.                             :   CASE NO. 3:12-cv-1596(RNC)
                                   :
RBS SECURITIES INC. AND            :
MATTHEW IAIN PAINE,                :
                                   :
        Defendants.                :

RULING AND ORDER

    Kirk McLeod, a former contractor at RBS Securities Inc.

("RBS"), brings this action under 42 U.S.C. § 1981 against RBS and

Matthew Iain Paine, his supervisor at RBS, alleging a hostile work

environment and unlawful retaliation.  RBS and Paine have moved for

summary judgment.  Plaintiff has failed to file a response.  For

the reasons that follow, the motion for summary judgment is

granted.

I. Background

    When a plaintiff fails to respond to a defendant's motion for

summary judgment, the facts set forth in the defendant's Rule

56(a)(1) statement may be deemed admitted.  See D. Conn. Local Rule

56(a)(1) ("All material facts set forth in said statement and

supported by the evidence will be deemed admitted unless

controverted by the statement required to be filed and served by

the opposing party in accordance with Local Rule 56(a)(2)"); see

also Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996); Gittens v.

Garlocks Sealing Technologies, 19 F. Supp. 2d 104, 108-09 (W.D.N.Y.

1998).  Because plaintiff has failed to oppose the motion for summary judgment, the Court regards as admitted the factual assertions set forth in defendants' Rule 56(a)(1) statement.  Those factual assertions show the following.

Plaintiff, a black male, worked as a contractor at RBS where he provided assistance to RBS's Change Management Group, part of RBS's Global Banking & Markets Division, on information technology projects.  Defs.' Rule 56(a)(1) Statement (ECF. No. 73-2) ¶ 1.  Plaintiff reported to Paine, the Managing Director of the Change Management Group, as well as Franca Paravati, a Director in the Change Management Group.  McLeod Tr. (ECF. No. 73-4) at 18:17—24; Paine Decl. ¶ 4 (ECF. No. 73-16).

In mid-June 2011, plaintiff overheard Denise Meceli, another contractor, telling two groups of co-workers (on two separate occasions) about her vacation in Florida, where she heard Caucasian children calling each other "my Nigger."  Defs.' Rule 56(a)(1) Statement (ECF. No. 73-2) ¶ 2—3.  Plaintiff did not work directly with Meceli but nonetheless was upset by her comments.  Id. ¶ 5—6.  Plaintiff wrote an email to Paine asking him to talk with Meceli about "her choice of humor in the workplace."  Id. ¶ 6.  Paine asked Meceli to apologize to plaintiff, which she did.  Id. ¶ 9.  Plaintiff then wrote Paine another email, thanking him for "taking the lead" and noting that he was "one of the fairest and balanced leaders [plaintiff] ha[d] ever had the opportunity to work for."  Id. ¶ 10.  Paine also informed Morgan Dell'Aquila, Human Resources

Business Partner for RBS, of Paine's original email expressing concern about Meceli's comments.  Id. ¶ 11.  Dell'Aquila spoke separately with both plaintiff and Meceli.  Id. ¶ 12.  In the meeting with Dell'Acquila, plaintiff stated that he had discussed the incident with Meceli, Meceli had apologized and he wanted nothing further to happen.  Id. ¶ 13.  Plaintiff then emailed Meceli and told her "I am totally fine with your apology . . . . I regret this happening."  Id. ¶ 14.  In Meceli's meeting with Dell'Acquila, Dell'Acquila reviewed RBS's policies regarding equal employment opportunity and the Code of Conduct, and explained that Meceli's comments were unacceptable.  Id. ¶ 15.  Neither plaintiff nor any of his co-workers reported any further complaints about Meceli.  Id. ¶ 16.

In April 2011, two months before the incident with Meceli, Paine had emailed plaintiff concerning the project on which plaintiff was then working, Project NEMO.  Id. ¶ 22, 24.  In his email Paine wrote, "We see this as a short term project, per our original agreement to move these on by the end of May."  Id. ¶ 24. On June 21, 2011, plaintiff wrote to Paravati, his other supervisor, stating, "If you go with QlikView my services will no longer be needed, correct?  I know this has been the long term plan for some time."  Id. ¶ 25.  Plaintiff then asked Paine to write him a letter of recommendation, noting that he believed he had "delivered everything" to Paine's satisfaction.  Id. ¶ 26.  After considering RBS's budget, Paine terminated plaintiff's contractor

3

job on August 11, 2011.  Id. ¶ 27.

Plaintiff alleges that before he was terminated he spoke with others at RBS regarding potential job opportunities.  The record with regard to these contacts reflects the following:

- Plaintiff contacted Managing Director Jeffrey Harwin and contractor Gerard Naughton about developing a data management and reporting system for anti-money laundering compliance.  Id. ¶ 30. Plaintiff learned that Harwin would defer to IT as to whether plaintiff would be involved in the project.  Id.  Plaintiff did not reach out to Vance Wilbur, the Director of Markets and International Banking-IT, or anyone else in IT about his interest in the project, and IT decided to manage the project internally rather than use a contractor.  Id. ¶ 31—32.

- Steve Wolfe, another contractor, approached plaintiff about creating a database and reporting tool in response to the Dodd-Frank Act under the direction of Craig Helgans, a Director in the Change Management Group.  Id. ¶ 33.  Plaintiff performed a demonstration of a project management tool for Helgans but Helgans did not understand plaintiff to be proposing that Helgans hire him. Id.  Nor did Helgans end up hiring him, as tools for use with projects related to the Dodd-Frank Act were already being developed under the supervision of Helgans' colleagues within Compliance. Id. at 33.

- Plaintiff met with Ron Cabral, a Director of Markets and International Banking regarding a project.  Id. ¶ 35.  Like the

4

others, Cabral did not hire plaintiff but instead went with two other outside candidates and an internal IT resource to work on the project. Id. ¶ 36.

- Plaintiff reached out to Margaret Podniesinski, a Director of Markets and International Banking, regarding potential job opportunities. Id. ¶ 38. Podniesinski did not hire plaintiff, nor does she have any recollection of meeting with him. Id. ¶ 39.

Finally, plaintiff claims that after his termination at RBS, a recruiter from an outside agency contacted him about a position at RBS posted on Dice.com and he responded by submitting his resume. Id. ¶ 40. Plaintiff alleges that Bharat Kumar Chelluboina, Vice President of Risk Technology, received his resume and that someone (possibly Paine) told Chellubonia not to select him. Id. ¶ 42; McLeod Tr. (ECF. No. 73-4) at 232:21-234:25. Plaintiff does not recall "the gist of" the position he was seeking and neither heard nor saw any communications by Paine discouraging others from hiring him. Id. ¶ 42.

None of these individuals - Wilbur, Helgans, Cabral, Podniesinski and Chellubonia - were informed of plaintiff's complaint to Paine regarding Meceli's comments. Id. ¶ 43.

II. Standard of Review

Summary judgment may be granted when there is no "genuine issue as to any material fact" and, based on the undisputed facts, the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). See D'Amico v. City of New York, 132 F.3d 145, 149

(2d Cir. 1998).  A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In assessing the evidence, the court must review the record as a whole, credit all evidence favoring the nonmovant, give the nonmovant the benefit of all reasonable inferences and disregard evidence favorable to the movant that a jury would not have to believe.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000).  Conclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact for trial.  Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003).

III. Discussion

    A. Hostile Work Environment

        1. RBS

Plaintiff claims that Meceli's comments created a hostile work environment in violation of his rights under § 1981.  To prevail on this claim with regard to RBS, he must demonstrate: "'(1) that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.'"  Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996) (quoting Murray v. N.Y. Univ. Coll. of Dentistry, 57 F.3d 243, 249 (2d Cir. 1995)).  The evidence in the record would

6

not permit a jury to make either finding.

There is no threshold number of harassing incidents above or below which a claim can or cannot be established as a matter of law.  Rather, the determination of whether a work environment is hostile must take into account "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity.'"  Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (quoting Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986)).

The parties do not dispute that plaintiff overheard Meceli comment to different groups of co-workers about Caucasian children in Florida calling each other "my Nigger."  Defs.' Rule 56(a)(1) Statement (ECF. No. 73-2) ¶ 2—4.  Her comments were unwelcome to him, and he made this known by emailing Paine, his supervisor, and requesting that Paine speak with Meceli.  Id. ¶ 6.  Paine spoke to Meceli, who then apologized to plaintiff.  Id. ¶ 8—9.  Paine also contacted Dell'Acquila of Human Resources who spoke to both Meceli and plaintiff separately.  Id. ¶ 11-12.  Plaintiff then emailed Meceli indicating that he was "totally fine with [her] apology."  Id. ¶ 14.

That Meceli's comments were not directed at plaintiff does not mean the comments could not contribute to a hostile work environment.  Schwapp, 118 F.3d at 110.  But plaintiff has not presented evidence that Meceli's comments amount to more than isolated incidents.  See Snell, 782 F.2d at 1103.  With the exception of Meceli's two comments, there is no evidence of racially derogatory remarks in the workplace.  Plaintiff admits that he never heard anyone else use a racial epithet at RBS or any other statement that he found offensive.  Defs.' Rule 56(a)(1) Statement (ECF. No. 73-2) ¶ 17.  On this record, Meceli's offensive comments are insufficient to support a claim.  See Little v. N.E. Utilities Serv. Co., CIV.A.3:05CV00806 AV, 2007 WL 781450, at *9 (D. Conn. Mar. 8, 2007) aff'd, 299 F. App'x 50 (2d Cir. 2008) (isolated incident of defendant referring to customer as a "black bitch" does not constitute hostile work environment); Robertson v. Sikorsky Aircraft Corp., 258 F. Supp. 2d 33, 42—43 (D. Conn. 2003) (one racially derogatory comment does not arise to "hostile work environment").

Even if Meceli's comments could reasonably be viewed as creating a hostile work environment, there is no basis for imputing liability to RBS.  An employer is liable for a hostile work environment created by a co-worker only "'if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action.'"  Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 72 (2d Cir. 2000) (quoting

<u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 759 (1998)); <u>see also</u> <u>Torres v. Pisano</u>, 116 F.3d 625, 633—34 n.7 (2d Cir. 1997) (Title VII (and § 1981) require an employer to take prompt and adequate measures to address the harassment that has occurred but do not require that an employer "fire all 'Archie Bunkers' in its employ" (quoting <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1486 (3d Cir. 1990)).

The record establishes that when RBS became aware of Meceli's comments, it promptly took effective remedial action.  Both Paine and Dell'Acquila spoke to or met with Meceli almost immediately after McLeod emailed about Meceli's comments.  Defs.' Rule 56(a)(1) Statement (ECF. No. 73-2) ¶ 8—12.  Dell'Acquila reviewed with Meceli RBS's policies regarding equal employment opportunity, as well as the Code of Conduct, and explained that Meceli's comments were unacceptable.  <u>Id.</u> ¶ 15.  Neither plaintiff nor any of his co-workers reported any other incidents involving Meceli.  <u>Id.</u> ¶ 16; <u>cf.</u> <u>Whidbee</u>, 223 F.3d at 72 ("[W]e have held that if harassment continues after complaints are made, reasonable jurors may disagree about whether an employer's response was adequate.").

2.  Paine

With regard to Paine, plaintiff cannot prevail unless he demonstrates an "affirmative link" that "causally connect[s]" Paine to the "discriminatory action."  <u>Whidbee</u>, 223 F.3d at 75.  This requires proof that Paine was personally involved in Maceli's offensive comments or grossly negligent in supervising Meceli.  <u>See</u>

Patterson v. County of Oneida, 375 F.3d 206, 229 (2d Cir. 2004)
("Personal involvement . . . includes not only direct participation
in the alleged violation but also gross negligence in the
supervision of subordinates who committed the wrongful acts and
failure to take action upon receiving information that
constitutional violations are occurring."). There is no such proof
in the record. To the contrary, plaintiff admits that Paine always
spoke to him in a respectful manner and never made a discriminatory
remark. Defs.' Rule 56(a)(1) Statement (ECF. No. 73-2) ¶ 18. And
it is undisputed that Paine acted swiftly to condemn Meceli's
comments, first by asking Meceli to apologize and then by informing
Human Resources. Id. ¶¶ 9, 11.

   B. Retaliation

   Plaintiff claims that Paine and RBS retaliated against him for
complaining about Meceli's comments by blocking him from obtaining
other potential opportunities at RBS.[1] Courts evaluate § 1981

---

[1] McLeod's complaint also alleges that RBS and Paine
retaliated against him by "terminating Plaintiff's employment as
a result of his protected complaints." Compl. (ECF. No. 1) ¶ 34.
McLeod has, in effect, abandoned his retaliation-by-termination
claim. At his deposition, McLeod testified that the only way
Paine retaliated against him was by blocking him from securing
other potential opportunities. McLeod Tr. (ECF. No. 73-4) at
249:16-250:4. In addition, McLeod does not dispute that he was
hired as a contractor, his employment was understood to be for a
short term, and that once this time had lapsed, he was terminated
pursuant to the express terms of his written employment
agreement. See Paine Decl. (ECF. No. 73-16) ¶¶ 2, 8. McLeod
presents no evidence that Paine terminated him because he made a
complaint against Meceli.

retaliation claims under a burden-shifting analysis.[2]  The
plaintiff must first establish a prima facie case of retaliation by
showing that (1) he engaged in protected activity under § 1981; (2)
the defendants were aware of this activity; (3) they took adverse
action against him; and (4) a causal connection exists between the
protected activity and the adverse action.  Fincher v. Depository
Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010).  If that
showing is made, the burden shifts to the defendant to offer a
legitimate, nondiscriminatory explanation for the adverse action.
Id.  The final burden belongs to the plaintiff, who must produce
evidence sufficient to support a reasonable inference that the
defendant's explanation is a mere pretext for retaliation.  Id.

    Defendants contend that plaintiff has failed to offer
admissible evidence to support a prima facie case.  I agree.  At
his deposition, plaintiff discussed the basis for his retaliation
claim.  He testified that Naughton told him that Paine "sabotaged"
the anti-money laundering compliance project as well as plaintiff's
opportunity to work on the project.  McLeod Tr. (ECF No. 73-4) at
181-87.  He testified that Wolfe, another contractor, told him that
Paine talked to Helgans about the Dodd-Frank position and that
Paine said "no, [McLeod] won't be working with them."  Id. at 221-
23.  He suggested that Paine may have interfered with his ability

---

    [2] Employment discrimination claims brought under § 1981 are
analyzed under the same burden-shifting framework used under
Title VII.  See Patterson, 375 F.3d at 225.

to obtain the position under Cabral.  Id. at 231.  He noted that
Ferris, a colleague, spoke to Podniesinski and, according to
Ferris, Podniesinski said that Franca "said good things and that
she has to weigh them against [the bad things that Paine] said."
Id. at 223—26.  Finally, he testified that he applied online at
Dice.com for the "exact same group that he worked in, in the exact
same department, doing the exact same duties."  Id. at 210—15.  But
he does not know who posted the job and whether Paine had any
involvement.  Id.

Plaintiff's reliance on hearsay is insufficient to make out a
prima facie case.  See Burke v. Evans, 248 F. App'x 206, 208 (2d
Cir. 2007) (affirming grant of summary judgment when "plaintiff did
not produce any evidence beyond vague recollections of
conversations with co-workers, anecdotes based on hearsay, and
other unsupported speculation to support his claim that his job
with the Bureau was terminated based on national origin, religion,
or sex"); Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d
155, 160 (2d Cir. 1999) (same when plaintiff relied on hearsay
statement that he had been told by a prospective employer that he
was not hired because of the lack of a positive reference).  As
defendants point out, a court should consider only admissible
evidence in ruling on a motion for summary judgment.  O'Reilly v.
Connecticut Light & Power Co., 3:06-CV-2008(RNC), 2009 WL 902389,
at *1 n.1 (D. Conn. Apr. 2, 2009) aff'd, 375 F. App'x 44 (2d Cir.
2010).

Even if plaintiff could make out a prima facie case, defendants have provided legitimate, nonretaliatory reasons for choosing others to fill the positions he cites and he has not contested their proffered reasons.  Based on the summary judgment record, RBS hired someone internally, rather than an outside contractor, to work on both the anti-money laundering compliance project, Defs.' Rule 56(a)(1) Statement (ECF. No. 73-2) ¶ 32, and the opportunity under Helgans, Helgans Decl. (ECF. No. 73-25) ¶ 4. Cabral moved forward with two candidates he believed were more qualified than plaintiff.  Dell'Aquila Decl. (ECF. No. 73-18) ¶ 11. And Podniesinski, who has no recollection of meeting with plaintiff, has reviewed his resume and determined that he did not have the experience necessary to assist her team at the time. Podniesinski Decl. (ECF. No. 73-23) ¶¶ 2, 6.  Plaintiff offers no admissible evidence that would permit a jury to view these explanations as pretextual.  See Aspilaire v. Wyeth Pharmaceutical, Inc., 612 F. Supp. 2d 289, 311 (S.D.N.Y. 2009) (granting summary judgment to employer on § 1981 retaliation claim when the decisionmaker "believed that another applicant was more qualified than plaintiff, and plaintiff has failed to set forth any evidence from which to infer that this reason was a pretext for discrimination").

At the final stage of the burden-shifting analysis, it is plaintiff's burden to offer evidence that would permit a jury to reasonably find that Paine or others at RBS undertook to deny him

job opportunities because of his complaint about Meceli's comments. He has not done so.

IV. <u>Conclusion</u>

Accordingly, the motion for summary judgment is hereby granted.  The Clerk may enter judgment and close the case.

So ordered this 30th day of September 2015.

_____/s/ RNC_____

Robert N. Chatigny
United States District Judge
